

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN A. COTTER          )
                              )
      Plaintiff,        )
                              )
      v.               )
                              )
VILLAGE OF MAPLE PARK;   )
MARK DELANEY, individually and in his )
official capacity as President/Mayor of the )
Village of Maple Park; SUSAN OLSEN, )    No. 04 C 1794
individually and in her official capacity as )
Trustee of the Board of Trustees of the Village )    Judge Joan H. Lefkow
of Maple Park; TERRY BORG, individually )
and in his official capacity as Trustee of the )
Board of Trustees of the Village of Maple Park; )
NICHOLAS MOISA, individually and in )
his official capacity as Trustee of the Board of )
Trustees of the Village of Maple Park; and )
CHESTER MORRIS, individually and in his )
official capacity as Chief of Police of the Village )
of Maple Park,         )
                              )
      Defendants.       )

## MEMORANDUM OPINION AND ORDER

Plaintiff John A. Cotter ("Cotter") filed this lawsuit against the Village of Maple Park (the

Village"), Mark Delaney ("Delaney"), Susan Olsen ("Olsen"), Terry Borg ("Borg"), Nicholas Moisa

("Moisa"), and Chester Morris ("Morris"), alleging that defendants conspired to violate and violated

Cotter's constitutional rights by placing him on administrative leave in retaliation for exercising his

First Amendment rights. Cotter also asserts a state law claim of breach of contract. The court has

jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Before the court are defendants'

motions for summary judgment, Cotter's motion to strike portions of defendants' Local Rule 56.1

Statement of Material Facts, and defendants' motion to strike portions of Cotter's affidavit. For the

reasons stated below, the court grants in part and denies in part Cotter's motion to strike, denies defendants' motion to strike, and grants defendants' motions for summary judgment.

## I.    SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## II.    MOTIONS TO STRIKE

### A.    Cotter's Motion to Strike Portions of Defendants' Local Rule 56.1 Statement of Material Facts

Cotter has raised hearsay objections and moved to strike paragraphs 15 through 19, 26, 27,

29, 40, 42, 47, 50, 51, 53, 54, 56, 66, 68, 71, 72, 79, 80, 83, 84, 94, 95, 105, 116-120, 127, and 130.

Parties may not rely on inadmissible hearsay to oppose a motion for summary judgment. *See Bombard* v. *Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Thus, an out of court statement that is offered not to prove the truth of the matter asserted but for some other legitimate purpose does not qualify as hearsay. *See United States* v. *Bursey*, 85 F.3d 293 at 296 (7th Cir. 1996). *See also United States* v. *Robinzine*, 80 F.3d 246 at 252 (7th Cir. 1996) (statements containing no assertion of fact that could be true or false were not hearsay because their significance "was *that* they were said (i.e., that a 'verbal act' occurred) and how they affected [the listener], not the truth-value of what was said.") (emphasis in original).

In paragraph 15 of Defendants' Local Rule 56.1 Statement of Material Facts ("DSF"), the defendants discuss a conversation between Morris and Sergeant Figgins of the St. Charles Police Department. *See* DSF ¶ 15. During the conversation, Figgins asked Morris whether Morris was aware of an alleged incident involving Cotter at a Meijer store located in St. Charles. *Id.* Cotter objects and moves to strike the statements contained in DSF ¶ 15 on the grounds that such statements are impermissible hearsay. Such statements, however, are not hearsay because defendants are not offering the statements for their truth-value. Instead, the statements or, more precisely, questions provide a context for the conversation and are offered to demonstrate their effect on the listener and to explain the steps that the listener took next. *See, e.g., Cooper-Schut* v. *Visteon Auto Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (district court properly admitted statement in affidavit referring to what employees had told the plaintiff for its effect on the listener, plaintiff, and not for the truth of the

3

statements). Accordingly, the court overrules Cotter's hearsay objection to DSF ¶ 15. The same analysis applies to Cotter's objections to DSF ¶¶ 16, 17, 19, 26, 27, 29, 50, 53, 54, 56, 71, 72, 79, 80, 83, 94, 95, and 105. Thus, the court overrules Cotter's objections to these paragraphs.[1]

Cotter's hearsay objections to DSF ¶¶ 18 and 116-120 involve the investigation conducted by Lieutenant Acosta of the Kane County Sheriff's Department into the Meijer-related allegations against Cotter. Lieutenant Acosta wrote a report of his investigation and attached various documents to his report. Had defendants offered the report of Lieutenant Acosta as evidence only that Lieutenant Acosta conducted an investigation, the court likely would sustain Cotter's hearsay objection. Defendants' primary purpose in offering the report, however, is to demonstrate its effect on defendants and to demonstrate the reasonableness of their decision to keep Cotter on administrative leave. *See United States* v. *Peco*, 784 F.2d 798 (7th Cir. 1986) ("Certain statements, which evidence the effect of the statements on the mind of the listener . . . are not hearsay. 'Statements may . . . be admitted to show . . .states of mind such as knowledge, motive, fear, or reasonableness in taking particular action.'"), *quoting* 4 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶ 801(c)[01](1984). The court, therefore, overrules Cotter's hearsay objections to DSF ¶¶ 18 and 116-120.

The court sustains Cotter's hearsay objection to DSF ¶ 40, which cites to the deposition of Borg for the following statement: "There were multiple incidents at the Meijer Store." Borg

---

[1]For the sake of clarity, the court notes that Cotter argues that DSF ¶¶ 50, 53, 54, 56, 71, 72, 94, and 95 discuss the beliefs of Borg, Olsen, and Moisa. These beliefs were based on the report prepared by Lieutenant Acosta. Therefore, Cotter argues, the statements of Borg, Olsen, and Moisa regarding their beliefs are hearsay. Unfortunately for Cotter, the Federal Rules of Evidence, including Rule 802, do not apply to materials used by employers in making employment or business decisions or, more generally, to life outside the courtroom. As a result, Borg, Olsen, and Moisa are allowed to testify regarding their beliefs and opinions, even if such beliefs or opinions were formed as a result of their consideration of hearsay materials.

4

admittedly had no first-hand knowledge of these incidents. Instead, he relied on the Kane County Police reports for this statement. Thus, the statement in DSF ¶ 40 is inadmissible as double hearsay, and the court will exclude it from its consideration.

The court overrules Cotter's hearsay objections to DSF ¶¶ 42, 47, 51, 66, 68, and 84, which relate to the advice that the Village's attorney, Bob Britz, provided during a closed-session Police Committee meeting on June 16, 2003. Again, defendants are not offering such advice for its truth value but for its effect on defendants and to explain the actions that defendants took in response to the advice that they received. The court also overrules Cotter's hearsay objections to DSF ¶¶ 127 and 130. These paragraphs discuss a Police Committee meeting on October 27, 2003. During the meeting Britz informed the Committee that he had met with Cotter to discuss options of resigning or appealing and asking that Cotter send a letter requesting a hearing if he wished. DSF ¶ 127. In response to a statement made by Cotter, Britz stated that he had never received any request from Cotter for a hearing or any request from Cotter for any type of documentation. DSF ¶ 130. Defendants are offering Britz's statements for their effect on defendants rather than their truth-value, and, therefore, the statements are not hearsay.

The court sustains Cotter's objections to DSF ¶¶ 47 and 48, which discuss the beliefs of the Police Committee and cite to Borg's deposition as evidence of the beliefs of the Police Committee. Borg may only testify as to his own belief. What other members of the Police Committee may or may not have believed is beyond the scope of his personal knowledge. The court also sustains Cotter's objection to DSF ¶ 60, which states, "No one was aware at that point that anything had ever been passed," and cites to Olsen's deposition in support of this statement. Again, Olsen may only testify as to what she knew; what others knew is beyond the scope of her personal knowledge.

5

In addition, Cotter objects to DSF ¶¶ 103,104, and 105, arguing that these paragraphs lack a proper foundation as to when the events described occurred. DSF ¶ 103 refers to Britz's recollection that the existence of Standard Operating Procedures was brought up in connection with the termination of Cotter's employment. DSF ¶ 104 discusses Britz's advice to the Board that the Village had passed an ordinance in April of 2001 that did not adopt Standard Operating Procedures for the Police Department. In DSF ¶ 105, defendants state that at a Board meeting sometime thereafter, Britz recalled that Village Trustee Ray McAdams had mentioned that Standard Operating Procedures had been passed in 1996 and that McAdams produced minutes of that meeting. None of these paragraphs mentions a time period in which these events occurred. Moreover, the court is unable to discern a general time period as to when these events occurred from the surrounding paragraphs in Defendants' Statement of Facts or from Britz's affidavit. As a result, the court grants Cotter's motion to strike DSF ¶¶ 103-105.

## B.     Defendants' Motion to Strike Portions of Plaintiff's Affidavit

Without specifying which paragraphs of Cotter's affidavit they would like stricken or which portions of his deposition testimony contradict his affidavit, defendants have moved to strike portions of Cotter's affidavit, arguing that those portions contradict his deposition testimony. In his affidavit, Cotter references his conversations with Borg and Olsen during which Borg and Olsen made statements demonstrating their awareness of certain investigations. At his deposition, however, Cotter was asked whether he was aware of any of the individual defendants making any statements that would indicate their awareness of his involvement in any investigations. In response, Cotter failed to reference the statements of either Borg or Olsen.

The court reviewed the thirty-seven pages of deposition testimony that defendants attached

6

to their motion to strike. The deposition testimony reflects the fact that Cotter was asked to identify the information that he had learned, either firsthand or through hearsay or anything else, that caused him to conclude that the individual defendants were aware of his involvement in the various investigations. *See* Cotter Dep. at 157, lines 13-17, 161, lines 3-8. Cotter responded to the questions, which resulted in his being asked tangential questions based on his answers. It does not appear that any follow-up questions were asked to ensure that Cotter had exhausted his memory as to his knowledge that individual defendants were aware of his involvement in the various investigations. Additionally, Cotter's statement in his affidavit concerning his conversation with Olsen does not reference Cotter's involvement in the investigation; it merely shows that Olsen was aware of the Trout investigation. As a result, it does not contradict Cotter's deposition testimony in any way. The court, therefore, denies defendants' motion to strike.

## III.    FACTS[2]

### A.    Background

Cotter was hired as a part-time police officer by the Village in August of 1996. (Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Material Facts ("PSF") ¶ 1). In August of 1999, Cotter was promoted to sergeant. (PSF ¶ 2; DSF ¶ 1). After sustaining an injury while working as a deputy sheriff with the DuPage County Sheriff's Department, Cotter went on medical leave on

---

[2] For purposes of deciding whether a genuine issue of material fact exists with regard to Cotter's claims, the court will only consider the material facts contained in Defendants' Statement of Facts and Plaintiff's Statement of Additional Facts to the extent that they are supported by their citations to the record. The court will note where the stated facts and their citations to the record diverge. Because defendants failed to file any response to Plaintiff's Statement of Additional Facts, the court deems those facts admitted to the extent that they are supported by their citations to the record. *See* L.R. 56.1(a). In addition, the court declines to consider Defendants' Supplemental Rule 56.1 Statement. The Local Rules of the Northern District of Illinois do not contemplate a supplemental statement. Additionally, defendants did not seek leave of the court to file such a statement. The court will deem admitted those facts in the Defendants' Statement of Facts to which Cotter raised an objection that the court did not sustain.

November 13, 2002. (PSF ¶ 3). The Village has not allowed Cotter to return from medical leave, and Cotter remains indefinitely on administrative leave. (PSF ¶ 20).

**B.    Investigations**

1.    Illinois State Police Investigation

In May of 2001, the Illinois State Police ("ISP") launched an investigation into allegations of illegal gambling, narcotics, and underage drinking in bars in the Village. (PSF ¶ 4). Cotter, John Mittvick ("Mittvick"), a part-time police officer with the Village, and other officials from the Maple Park Police Department assisted the ISP in its investigation of these allegations throughout 2001 and 2002. (PSF ¶¶ 4, 7). This investigation resulted in felony indictments being brought against Delaney, the Village president, and Morris, the Village's Chief of Police, in May of 2004. (PSF ¶ 4).

2.    Investigation into Unlawful Land Transfer, Transfer of Village Funds, and Possible Conflict of Interest

In August of 2002, Raymond McAdams ("McAdams"), the Village's former president, contacted both Cotter and Mittvick in their capacities as police officers for the Village, asking that they investigate allegations that the Village was involved in an unlawful land transfer and transfer of Village funds. (PSF ¶¶ 5, 9). McAdams also was concerned about a possible conflict of interest involving Olsen, a trustee on the Village's Board of Trustees, who allegedly had a vested interest in a company involved in the transfers but who also had participated as a trustee in a vote involving the land transfer and transfer of Village funds. (PSF ¶ 6). McAdams forwarded documents to Cotter regarding his allegations, which Cotter then forwarded to then chief of police, Claude Oesterreicher ("Oesterreicher"), and Mittvick for further investigation. (PSF ¶ 7). McAdams also sent documents to Mittvick, which Mittvick shared with Cotter and Oesterreicher. (PSF ¶ 10).

Mittvick conducted an investigation and wrote a report about the allegations. (PSF ¶ 14). In early 2003, he contacted the ISP about the alleged unlawful transfer of Village funds and possible illegal conduct committed by Delaney. (PSF ¶ 16). On February 5, 2003, Mittvick prepared a supplemental report regarding the improper transfer of Village funds, the efforts made by Delaney and the Village trustees to return the funds, and the knowledge of Delaney and the Village trustees of the illegal transfer of funds. (PSF ¶ 17). That same day, the Village terminated Mittvick's employment. (PSF ¶ 18).

Oesterreicher also had received complaints regarding the improper land transfer and Olsen's potential conflict of interest. (PSF ¶ 12). He turned this matter over to the DeKalb County authorities. (PSF ¶ 12). Additionally, Oesterreicher had received complaints concerning the illegal transfer of Village funds, which he turned over to the Kane County authorities. (PSF ¶ 13). Shortly after the Village terminated Mittvick's employment, Oesterreicher was forced to resign as chief of police. (PSF ¶ 19).

3.     Trout Incident

On September 24, 2002, Jerry Nordan, a Village police officer, contacted Mittvick about an incident involving disorderly conduct between Jay Trout and Olsen. (PSF ¶ 45). Mittvick reviewed Nordan's report and informed his chain of command about the incident. (PSF ¶¶ 46, 47). At that point in time, the chain of command consisted of a patrol officer reporting to the patrol sergeant, Mittvick, who reported to the sergeant, Cotter, who reported to the chief of police, Oesterreicher. (PSF ¶ 48). Mittvick also prepared a supplementary written report regarding this incident on September 29, 2002. (PSF ¶ 49). He then turned the investigation over to the DeKalb County State's Attorney office for further investigation. (PSF ¶ 50).

4.     Morris' Traffic Stop

In December of 2002, Mittvick conducted a traffic stop of Chester Morris. (PSF ¶ 34). Mittvick asked Morris for his driver's license and proof of insurance. (PSF ¶ 35). In response, Morris opened his wallet and showed Mittvick a badge. (PSF ¶ 36). Mittvick asked Morris about the badge, and Morris informed Mittvick that he was a Kane County Deputy Coroner. (PSF ¶ 37). Mittvick then went back to his car and contacted Cotter to ask him if he was familiar with Morris. (PSF ¶ 38). Cotter informed Mittvick that Morris was not a Kane County Deputy Coroner and had not been so for quite some time. *Id.* Cotter also authorized Mittvick to investigate Morris for false impersonation. *Id.* Mittvick confirmed with the Kane County Coroner's office that Morris had not been a deputy coroner for at least a year. (PSF ¶ 39). Before having an opportunity to conclude or document his investigation of Morris, however, Mittvick was terminated. (PSF ¶ 40).

C.     **Defendants' Knowledge of the Investigations**

The allegations regarding the illegal transfer of Village funds and Olsen's purported conflict of interest were matters of public knowledge that had been discussed at public meetings or open Board meetings. (DSF ¶¶ 114-15).

1.     Borg

In the last quarter of 2002 and into early 2003, Leonard Stover, a part-time police officer with the Village attended several Village board meetings in which the alleged unlawful transfer of Village funds, including the McAdams complaint, was discussed. (PSF ¶¶ 26, 27). At one of those board meetings, Stover overheard a conversation between Borg and Cotter about the alleged unlawful transfer of Village funds and McAdams' complaint. (PSF ¶ 28). Borg stated that he was aware that

10

an investigation of some sort was taking place. (PSF ¶ 29).[3]

    2.      Delaney

In mid-January of 2003, Mittvick was driving his squad car through the Village when Delaney hailed him. (PSF ¶ 41). Delaney told Mittvick that he knew that the Maple Park Police Department was investigating him. *Id.* Mittvick informed Delaney that everything had been turned over to the ISP. *Id.* Delaney then responded, "You won't be around long enough to see this through." *Id.*

Several months later, Cotter attended a Village board meeting with his wife and child. (PSF ¶ 44). After the meeting had concluded, Delaney commented to Cotter, "You have a nice family. You should think about your family over this issue." *Id.*

    3.      Olsen

At some point in October of 2002, Olsen confronted Cotter in the hallway of the Village Hall. (PSF ¶ 51). She told Cotter that she was aware of the Trout incident investigation and that since she was a member of the Village's Police Committee, "the investigation would go nowhere." (PSF ¶ 51).[4]

    4.      Moisa

Moisa was unaware that Cotter was involved in any investigation of the matters alleged in the complaint in the present matter. (DSF ¶ 91).

---

[3]Defendants dispute that Borg was aware of Cotter's involvement in any investigation. DSF ¶ 57.

[4]Defendants dispute that Olsen was aware of any investigation that Cotter was performing. *See* DSF ¶ 69.

11

**D.    Investigation of Cotter**

1.    Meijer Incident

On January 29, 2003, Oesterreicher received a telephone call from Shift Commander Figgens of the St. Charles Police Department regarding an incident involving Cotter at Meijer, a store located in St. Charles. (PSF ¶ 53). Oesterreicher spoke with Cotter about this incident and then decided that the allegations against Cotter did not require further investigation. (PSF ¶¶ 54, 55).

Morris was appointed the Village's chief of police by the Board of Trustees in March of 2003. (DSF ¶ 14; PSF ¶ 57). Shortly after his appointment, Morris spoke with Shift Commander Figgens. (DSF ¶ 15). Figgens asked Morris whether he was aware of the incident involving Cotter at Meijer. (DSF ¶ 15). Morris was unaware of the incident, and, in response to what he had learned from Figgens, Morris spoke with a security officer at Meijer. (DSF ¶ 16). The security officer told Morris that Cotter had attempted to get special privileges from store employees on several occasions by identifying himself as an undercover officer. (DSF ¶ 17). The security officer then provided Morris with a report that he had prepared. *Id.*

Morris asked the Kane County Sheriff's Department to investigate the allegations against Cotter. (DSF ¶ 18). Morris also notified Moisa, a trustee on the Village's Board of Trustees, and Delaney about what he had learned and that he was going to request that the Kane County Sheriff's Department investigate the matter. (DSF ¶ 19). Morris subsequently received copies of the Kane County Sheriff's Department investigation, and he provided a copy to Moisa, who was the chairman of the Village's Police Committee. (DSF ¶¶ 20, 22). Other than Sergeant Figgens, no one from the Kane County Sheriff's Department or the St. Charles Police Department contacted Cotter to ask him about what had occurred at Meijer. (PSF ¶ 56). Morris also did not ask Cotter about his version of

12

events. (PSF ¶ 65). Additionally, there is no incident report or computer aided dispatch entry from the St. Charles Police Department regarding the Meijer incident. (PSF ¶¶ 72, 73).

2.    Cotter's License Plates

Morris also learned that Cotter had the Village's police department address listed on his personal vehicle registration.[5] (DSF ¶¶ 23, 24). Morris also checked Cotter's registration through the Illinois Secretary of State's computer and discovered that the address of the Village's police department was listed on the vehicle registration. (DSF ¶ 24).[6] Cotter's registration showed his name followed by his wife's name as owners, followed by "Maple Park Police Department" and the address of the police department. (DSF ¶ 24). Without speaking to Cotter about his vehicle registration, Morris contacted the Illinois Secretary of State's office to have Cotter's registration amended and the vehicle registration of Cotter's wife revoked. (PSF ¶¶ 62, 66; DSF ¶ 31).

E.    **Defendants' Response to Investigation of Cotter**

1.    Delaney's Conversation with Stover

In late February or early March of 2003, Stover had a conversation with Delaney in which

---

[5]There is some dispute as to when and how Morris learned of Cotter's vehicle registration. According to defendants, Morris learned that Cotter had the Village listed on his personal vehicle registration through the investigation conducted by the Kane County Sheriff's Department. *See* DSF ¶¶ 23, 24. Additionally, at an unspecified time, Morris received license plates for Cotter's personal vehicle at the Maple Park Police department. DSF ¶ 30. Cotter contends that Morris had run Cotter's plates prior to receiving any report from the Kane County Sheriff's Office. *See* PSF ¶ 60.

[6]Defendants also contend that Cotter listed the Maple Park Police Department as an owner of his personal vehicle. *See* DSF ¶¶ 23, 24. In his responses to DSF ¶¶ 23 and 24, Cotter disputes that the Village's police department was listed as an owner on Cotter's vehicle registration and cites to his own affidavit in support of his assertion. *See* Cotter affidavit at ¶¶ 7-13; *see also* PSF ¶¶ 61. In addition, Cotter attached as exhibits the registration inquiry printouts from the Illinois Secretary of State's Office from April 5, 2003 and May 8, 2003. *See* Docs. 000033 and 000034. The registration inquiries list John Cotter, "Mult Owner," and Shanda Cotter, immediately followed by Maple Park Police and the address of the Village's police department. *Id.* Taking the facts in the light most favorable to Cotter, the Maple Park Police Department was not listed as an owner but merely included in the address. Other facts demonstrate, however, that the members of the Police Committee believed that the Village's Police Department was listed as an owner on Cotter's registration of his personal vehicle, as the registration inquiries make no distinction between the "owner" lines and "address" lines.

13

Stover advised Delaney that Cotter was ready to return from medical leave. (PSF ¶ 31). Delaney said that there was no way that Cotter would be allowed to return to the Village's police force. *Id.* Delaney said that he would have terminated Cotter like Mittvick and Oesterreicher. *Id.* Since Cotter was on medical leave, however, Delaney was concerned about an ADA lawsuit. *Id.*

Delaney then asked Stover whether Stover was aware of the Meijer incident involving Cotter. (PSF ¶ 32). Stover informed Delaney that he was not aware of this incident. *Id.* Delaney informed Stover that Delaney had heard that Cotter wanted to "get freebies from the store by popping his badge." *Id.* Stover then asked Delaney if Delaney wanted Stover to investigate the matter. *Id.* Delaney responded in the negative, saying that he would "take care of it later." (PSF ¶ 7).

### 2. June 2003 Police Committee Meeting

At the June 2003, closed-session meeting of the Village's Police Committee, which consisted of Moisa, Borg, and Olsen, Morris presented the Kane County Sheriff's report of the Meijer incident and information about Cotter's vehicle registration to the Police Committee.[7] (DSF ¶¶ 25, 37, 41, 65, 67, 81). Moisa read aloud from the report. (PSF ¶ 78). After reviewing the materials, the Police Committee told Morris to place Cotter on administrative leave. (DSF ¶ 26).

Bob Britz, the Village's attorney, also was present at the Police Committee meeting. (DSF ¶ 28). He provided advice when asked by the members of the Police Committee. (DSF ¶ 42). In particular, Britz informed the members of the Police Committee of his belief that Cotter's registration of his personal vehicle to the Village violated the law and potentially exposed the Village to liability in the event that Cotter or his wife was in an accident. (DSF ¶ 98).

---

[7] Cotter objects to DSF ¶ 25 for lack of a proper foundation but admits that this meeting took place and even provides the date. Defendants subsequently provided information about the approximate date of this meeting. *See* DSF ¶ 37. Accordingly, the court overrules Cotter's objection.

14

Moisa had heard first about the Meijer incident from Morris shortly after Morris was appointed chief of police. (DSF ¶ 78). Morris told Moisa that there had been a complaint by Meijer employees about Cotter; Morris was having it investigated; and Morris would notify Moisa of the results. (DSF ¶ 79).[8] Moisa has stated that he decided to put Cotter on administrative leave only because of the Meijer incident and the vehicle registration. (DSF ¶ 85). Moisa understood that although Cotter could use the police department's address, he could not use the police department's name on his vehicle registration. (DSF ¶ 84). Similarly, Olsen believed that Cotter's personal vehicle license plate was registered to the Village of Maple Park, which Britz said was a potential liability problem. (DSF ¶¶ 51, 69).

The Police Committee decided that Cotter should be placed on administrative leave, that Cotter should be given an opportunity to respond to the charges, and that Britz would communicate with Cotter about this issue. (DSF ¶¶ 29, 43, 44). Morris also recommended to the Police Committee that Cotter's employment be terminated. (DSF ¶ 32). According to Morris, he made this recommendation because of the Kane County Sheriff's Department's investigation of the Meijer incident and Cotter's vehicle registration. (DSF ¶ 32).

Laurie Heyob ("Heyob"), a Village trustee, also was present at the meeting. (PSF ¶ 78). Although she requested to see a copy of the document from which Moisa was reading, Moisa refused to provide her with a copy. (PSF ¶ 79).

After the meeting of the Police Committee, the Village's Board directed Britz to contact Cotter to arrange a date so that Cotter could present his side of the story. (DSF ¶ 83). Morris also

---

[8]Cotter objects DSF ¶ 79 for a lack of foundation. The court finds that there is a sufficient foundation for DSF ¶ 79 within the context of Defendants' Statement of Facts. Moisa and Morris spoke shortly after Morris was appointed chief of police, which occurred on March 15, 2003.

sent a letter dated June 16, 2003 to Cotter. (DSF ¶¶ 27, 99). This letter notified Cotter that he was being placed on administrative leave, effective immediately, pending an investigation into the Meijer incident. (DSF ¶ 27).

Morris then sent Cotter a letter dated June 18, 2003, which advised Cotter that Morris was "recommending to the Board of Trustees that you be terminated as an employee and police officer of the Village of Maple Park." (DSF ¶¶ 121, 122). The letter notified Cotter that he did not have a property right in his employment and set forth the following charges:

1. Exhibited conduct unbecoming a police officer by seeking to obtain personal advantage for himself at the Meijer Store in St. Charles on January 29, 2003 and numerous times before then, by claiming to be an undercover police officer;

2. Violated the public trust and confidence by seeking to obtain an unfair advantage with regard to purchases at the Meijer Store by representing that he was an undercover police officer, which incident occurred on January 29, 2003 and numerous times prior to that;

3. Without Village authorization, acquired and displayed on his personal vehicle Illinois license plates registered to the Village of Maple Park Police Department and Village of Maple Park address;

4. Exposed the Village to potential liability by having his personal vehicle registered to the Village of Maple Park without the Village having in place liability insurance for said vehicle.

(DSF ¶ 122). The letter concluded that the Police Committee had decided to give Cotter an opportunity to meet with it to discuss the charges and his termination. (DSF ¶ 123). The letter instructed Cotter to contact Morris if he wished for such a meeting to take place. *Id.*

Britz also spoke with Cotter in July of 2003, notifying Cotter that he had prepared a letter of resignation for Cotter. (DSF ¶ 102). Britz gave the letter of resignation to Cotter, advising him that he could either resign or they would move forward with termination proceedings. *Id.*

16

Cotter responded with a letter dated August 13, 2003, which he hand-delivered to Britz and addressed to Delaney and Morris, notifying them that he did not understand the basis for being placed on administrative leave and requesting a return to active duty. (PSF ¶ 76; DSF ¶ 124). Cotter's letter also stated that neither state statute nor the rules and regulations of the police department provided for "administrative leave" and that he was eligible to return to work. (DSF ¶ 124). The letter closed by asking the he be advised of his return date. (DSF ¶ 124).

In response to Cotter's letter, Britz sent a letter dated August 14, 2003 to Cotter in which he notified Cotter of the police committee meeting on October 27, 2003 and invited Cotter to attend to discuss the reasons for his termination. (DSF ¶ 125).

2.      October 27, 2003 Police Committee Meeting

On October 27, 2003, another closed-session Police Committee meeting was held. (DSF ¶¶ 86, 126). Britz informed the committee that he had met with Cotter to discuss Cotter's options of resigning or appealing and that he had asked that Cotter send a letter requesting a hearing if he so wished. (DSF ¶ 127). Cotter was present at this meeting, and Moisa read the complete Kane County report aloud. (DSF ¶ 86). In addition, the list of allegations against Cotter was read. (DSF ¶ 128). Cotter responded that the meeting was the first that he had heard of the allegations, that he was unclear why he was there, that he had not been provided any documentation, that he was unfairly prejudiced, and that he was unprepared to discuss or respond to any of the allegations. (DSF ¶¶ 87, 129). Cotter had not received a copy of any written report regarding the Meijer incident until this meeting. (PSF ¶ 77). Britz responded that he had never received a request from Cotter for a hearing or any request for any type of documentation. (DSF ¶ 130).

17

Cotter was notified by a letter dated December 19, 2003 that the matter had been tabled and was to be considered at the Board of Trustees meeting of January 6, 2004. (DSF ¶ 131).[9]

3.      Board of Trustees Meeting

In January of 2004, the Village's Board of Trustees met to vote on the recommendation of the Police Committee to terminate Cotter's employment. (DSF ¶¶ 52, 89, 109). The vote was split, however, with Moisa, Borg, and Olsen voting in favor of Cotter's termination and with Hume, Heyob, and McAdams voting against Cotter's termination. (DSF ¶¶ 52, 89, 109).

Olsen voted in favor of terminating Cotter because she felt strongly about the liability issue connected with the Cotter's vehicle licensing. (DSF ¶ 70). She also voted to terminate Cotter because of the Meijer incident. In her opinion, Cotter had violated the public trust and confidence. (DSF ¶¶ 71, 72). Likewise, the investigation into the Meijer incident and Cotter's vehicle registration had made Borg concerned about Cotter's ability to make good judgments. (DSF ¶ 50). He believed that Cotter showed very poor judgment in terms of acquiring special privileges from a store by using his role as a police officer as leverage. (DSF ¶ 53). Accordingly, Borg voted to terminate Cotter's employment. (DSF ¶ 54). Delaney abstained from voting. (DSF ¶ 110).

Because of this deadlock, Cotter has remained on administrative leave. (PSF ¶ 20). Cotter received notice that he is to remain on administrative leave pending further investigation in a letter from Morris dated January 7, 2004. (PSF ¶ 92).

---

[9]DSF ¶ 131 contains an error in that the stated date of the Trustees meeting was June 6, 2004, rather than January 6, 2004, as stated in the letter. *See* Cotter Dep. Ex. 12. Because Cotter admits to receiving the letter and that the letter speaks for itself, the court will construe the letter as written and not as misstated by defendants.

## F.    Standard Operating Procedures

The Village's board of trustees reviewed, considered, and adopted Standard Operating Procedures ("SOPs") by motion in May of 1996. (PSF ¶ 82; DSF ¶ 136). Like all police officers who worked under Oesterreicher at the Village's police department, Cotter received a bound copy of the SOPs when he first became a police officer with the Village in 1996. (PSF ¶¶ 84, 86, 87). In March of 2001, Cotter signed another written statement of compliance and understanding in which he agreed to follow the provisions of the SOPs under penalty of dismissal from the Village's police department. (PSF ¶ 88). In reliance on the SOPs, Cotter believed that the Village's police officers were afforded progressive discipline such that an officer would receive written notification of charges before any dismissal or termination proceedings could be instigated. (PSF ¶¶ 89, 90).

The Standard Operating Procedures established, with regard to internal investigations, the following:

> In the event an Officer shall be charged with wrongdoing, the Chief of Police, or his designee (this may include an outside agency, or private person) will investigate. [*sic*] To the fullest extent of the law, all charges against an Officer. [*sic*] After said investigation, the facts will be reviewed by the Police Committee, and the Officer so charged will be called in, in a closed session meeting, to hear the charges against her/him, and then be allowed to answer the charges. The committee will review the charges and any other information presented during the Officer's testimony, and will make their determination based on the facts presented. If the Committee determines that there is validity in the charges, the matter may be handled within the Police Committee, or may be referred to the Personnel Committee. Additionally, an Officer may request a hearing before the complete Village of Maple Park Board of Trustees.

(DSF ¶ 138). With regard to dismissals, the Standard Operating Procedures provided, in part,

> During the course of an Officer's employment with the Maple Park Police department, the commission of an infraction of the rules and/or regulations by and [*sic*] Officer, may be grounds for dismissal from the Department. . . . [E]ach

19

infraction will be evaluated at the time of occurrence. If the infraction is deemed of a serious nature, termination may result immediately, after a thorough investigation is complete, and a review of the case is completed.

At the time that formal charges are filed. [sic] The Chief of Police and the Police Committee shall determine whether or not to place the Officer on suspension, and whether or not he/she will be paid during the period of suspension. Dismissal proceedings may occur only after the Officer as [sic] been appraised of the infractions, and has received written notice of the charges against her/him. After an Officer has received written notification, he/she may request a formal hearing before the Police Committee to answer the charges. At that time, the Chief of Police or his designee will present the facts of the charges, and any/all documents against the Officer. The Officer may question said facts, and present information in her/his own defense.

When all information has been presented from both sides, the Committee may make a decision based only on the facts presented. The Officer may appeal the decision of the Police Committee to the Personnel Committee. . . .

(DSF ¶ 139).

On April 3, 2001, the Board of Trustees adopted Ordinance No. 01-04, which was entitled "Ordinance Adopting Hiring Standards for Part-Time Police Officers." (DSF ¶ 133). This ordinance provided, in part, "That hiring, discipline and termination proceedings shall be as set forth in the Village of Maple Park Police Standard Operating Procedures, as from time to time amended and adopted by Ordinance by the Board of Trustees of the Village of Maple Park." (DSF ¶ 133). No document entitled "Standard Operating Procedures" was attached to this ordinance, however, and there is no other Village ordinance adopting or referencing Standard Operating Procedures for the Police Department. (DSF ¶ 135).

20

## IV.    ANALYSIS

### A.    First Amendment Retaliation Claim

Cotter asserts that the defendants violated his constitutional rights by retaliating against him for exercising his First Amendment rights. In evaluating a First Amendment retaliation claim brought pursuant to § 1983, the court applies a three-step test premised on the Supreme Court's decisions in *Pickering* v. *Bd. of Educ.*, 391 U.S. 563, 568, 29 L. Ed. 2d 811, 88 S. Ct. 1731 (1968), and *Connick* v. *Myers*, 461 U.S. 138, 147, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983). *Cygan* v. *Wis. Dep't of Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004). First, the plaintiff must prove that his speech related to a matter of public concern. *Gustafson* v. *Jones*, 290 F.3d 895, 906 (7th Cir. 2002); *see also Connick,* 461 U.S. at 147; *Lifton* v. *Bd. of Educ. of Chi.*, 416 F.3d 571, 575 (7th Cir. 2005). Second, the plaintiff must establish that his speech played a substantial part in the employer's decision to take an adverse employment action against him. *Gustafson*, 290 F.3d at 906. Third, the defendants have the opportunity to show that they would have taken the adverse action against the plaintiff even in the absence of his comments. *Cygan*, 388 F.3d at 1098. The determination of whether speech is constitutionally protected is a question of law for the court. *Sullivan* v. *Ramirez*, 360 F.3d 692 at 698 (7th Cir. 2004), *citing Kokkinis* v. *Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). Defendants are not contesting that Cotter's investigation related to a matter of public concern. The court, therefore, will proceed with its analysis of the remaining elements.

### 1.    Defendants' Motive

Cotter must prove that his speech played a substantial role in the defendants' decision to take an adverse employment action against him. *Gustafson*, 290 F.3d at 906. Cotter claims that

21

because defendants knew that he was involved in investigations that would have subjected the Village's board members, president, and chief of police to public scrutiny, his employment status was placed in limbo, effectively terminating his employment. This claim fails for numerous reasons.

First, the evidence does not support a finding that each of the defendants knew of Cotter's involvement in the investigations, which precludes Cotter from succeeding on his claim of First Amendment retaliation. *See Stagman* v. *Ryan*, 176 F.3d 986 at 999-1000 (7th Cir. 1999), *quoting O'Connor* v. *Chicago Transit Auth.*, 985 F.2d 1362, 1369-70 (7th Cir. 1993) ("Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech."). Cotter attempts to connect the individual defendants' knowledge of the various police department investigations to a specific awareness of Cotter's involvement in these investigations based on nothing more than their knowledge that Cotter was a member of the police department. *See* Plaintiff's Response Memorandum at 7-10.

Cotter argues that because Morris knew that he was stopped by Mittvick and improperly identified himself as a Kane County Deputy coroner, Morris should have known that an investigation would ensue. Because Cotter was the only remaining officer at the police department once Morris became the chief of police, Cotter then argues that Morris must have known that Cotter was involved in the investigation of Morris' misrepresentation. Absent from this argument is evidence that Morris, in fact, knew that Mittvick would launch or had launched an investigation. There is no evidence showing that Mittvick had told Morris that he, Mittvick, knew that Morris was not a Kane County Deputy coroner or that Cotter had authorized Mittvick to investigate Morris' false impersonation. Had Mittvick or any other member of the Village's

police department given Morris that information, it would follow that Morris should have known that an investigation would occur. In the absence of evidence suggesting that Morris had that information, however, there is no genuine issue of material fact that Morris believed an investigation had been initiated.

Additionally, Cotter has not contradicted Moisa's averment that he was unaware of Cotter's involvement in the investigations, entitling Moisa to summary judgment on Cotter's claim of retaliation. While Borg stated in a conversation with Cotter that Borg was aware that an investigation into the unlawful transfer of Village funds was on-going, absent from this conversation is any statement pertaining to Cotter's involvement in the investigation. Cotter has not proffered any other evidence that would suggest that Borg knew of Cotter's involvement in the investigation. Similarly, Olsen's statement to Cotter regarding the investigation of the Trout incident did not establish that Olsen knew that Cotter was involved in the investigation. Likewise, Delaney's statement to Mittvick regarding the police department's investigation of him did not demonstrate that Delaney was aware of Cotter's involvement in any investigation.

Second, even if the court were to infer that defendants knew of Cotter's involvement in the investigations, the timing of Cotter's placement on administrative leave after his participation in the investigations does not by itself suggest a causal relationship between the events. *See Lalvani* v. *Cook County, Ill.*, 269 F.3d 785, 790 (7th Cir. 2001) ("When an adverse employment action follows close on the heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied."). Olson was aware of the investigation into the "Trout Incident" as late as October of 2002, as evidenced by her comments to Cotter, which she

23

made approximately eight months before Cotter was placed on administrative leave. The investigations into the alleged unlawful transfer of Village funds and Olson's alleged conflict of interest were matters of public knowledge as early as the last quarter of 2002 or early 2003. Delaney expressed his awareness of the police department's investigation of his activities in January of 2003, approximately six months before Cotter was placed on administrative leave. Although suspicious timing alone may permit an inference of a retaliatory motive for an adverse employment action occurring "on the heels" of a protected activity, where, as here, the adverse employment action occurred between six and eight months after the protected activity and there is no other evidence that supports the inference of a causal link, the timing fails to suggest a causal relationship between the two events. *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390 (7th Cir. 1999) (four months negates causal inference); *Davidson v. Midelfort Clinic*, 133 F.3d 499 (7th Cir. 1998) (no causal inference where employee was terminated five months after filing EEOC complaint, even though complaint was still pending). As such, Cotter has failed to establish a *prima facie* case of retaliation.

    2.      Pretext

Third, even if the court were to infer that defendants knew of Cotter's involvement in the investigations and to find that the timing of the events supports a causal link between Cotter's speech and his placement on administrative leave, Cotter's retaliation claim fails because he has not established that he was placed on leave for a reason other than those offered by defendants. *Pugh v. City of Attica*, 259 F.3d 619 at 629 (7th Cir. 2001), *citing Foster v. Arthur Anderson, LLP*, 168 F.3d 1029 at 1035 (7th Cir. 1999) ("[T]iming alone does not create a genuine issue as to pretext if the plaintiff is unable to prove, through other circumstantial evidence, that he was

terminated for a reason other than that proffered by the employer."). In the context of summary judgment, "[i]n order to reach a jury with a theory of First Amendment retaliation, [plaintiff] must show that a reasonable jury could conclude that [defendants'] stated, legitimate reason for his termination is a lie." *Little* v. *Ill. Dep't of Revenue*, 369 F.3d 1007 at 1016 (7th Cir. 2004), *citing Vukadinovich* v. *Bd. of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir. 2002).

Defendants have explained that Cotter was placed on administrative leave as a result of the Meijer incident and because Cotter had listed the name and address of the Village's Police Department on his personal vehicle's registration. They presented evidence that Morris was contacted by Sergeant Figgens about the Meijer incident and that Morris asked the Kane County Sheriff's Department to investigate the allegations against Cotter. Morris received a report of the investigation, which he presented to the Village's Board of Trustees. The members of the Village's Board of Trustees who voted in favor of terminating Cotter's employment, Moisa, Borg, and Olsen, have explained that they voted to terminate Cotter's employment because Cotter had violated the public trust by seeking special benefits from Meijer when representing himself as an undercover police officer and that they were concerned about his ability to make good judgments. Britz also advised the Board of Trustees that, in his opinion, having the police department listed on Cotter's personal vehicle registration violated the law and potentially exposed the Village to liability in the event that Cotter or his wife were in an accident.

To establish pretext, Cotter must demonstrate that these proffered reasons are a lie, which he fails to do. Cotter argues instead that the Meijer incident is unsupported by any credible

25

evidence[10] and that it defies common sense to suggest this his vehicle registration would subject the Village to liability. It is not relevant, however, whether the Meijer incident occurred or whether listing the Village's Police Department on Cotter's personal vehicle registration would have subjected the Village to liability; what is relevant is whether defendants believed these reasons. *See Stewart* v. *Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered."). The court also fails to see how it defies common sense to suggest that having a personal vehicle registration list the Village Police Department's name and address would subject the Village to liability. The fact that the Village ultimately may not be held liable for any accident involving Cotter's personal vehicle would not necessarily prevent a party involved in such an accident from filing suit against the Village to recover damages.

Cotter also argues that Oesterreicher, when notified of the Meijer incident, decided that the allegations regarding this incident did not warrant further investigation and that defendants have not produced any evidence that this decision was improper or unethical. Instead, Cotter concludes, it was the correct decision under the circumstances. Morris, however, reached a different conclusion when receiving information of the incident, but this does not establish pretext, as this court does not sit as a "super-personnel department" that reexamines an entity's business decisions. *See Hudson* v. *Wal-Mart Stores, Inc.*, 412 F.3d 781 at 786 (7th Cir. 2005), citing *Foster* v. *Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999) ("The judiciary is not a super-personnel department that reexamines and reinvestigates employee disputes.").

---

[10]This argument primarily references the hearsay nature of the police report, which is an issue that the court considered and rejected above. *See, supra*, note 1.

Moreover, Cotter's allusion to a shoddy investigation of the Meijer incident, even if true, fails to establish pretext. *See Kariotis* v. *Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997) (rejecting plaintiff's argument that he could show pretext by establishing that the employer engaged in an impulsive, shoddy investigation).

Because Cotter has failed to establish a *prima facie* case of retaliation, and has failed to show that defendants' stated reasons for Cotter's placement on administrative leave were so unreasonable as to create the inference that defendants did not subjectively believe in these reasons, there are no genuine issues of material fact. The court, therefore, grants defendants' motion for summary judgment on Cotter's claim of First Amendment retaliation.

## B.    DUE PROCESS CLAIM

Cotter claims that he was denied his constitutional right to procedural due process when defendants placed him on administrative leave without giving him notice of the charges against him or an explanation of the charges. In evaluating a procedural due process claim, the court engages in a two-part inquiry, asking, "(1) whether the defendants deprived the plaintiff[] of a constitutionally protected liberty or property interest; and (2), if so, whether that deprivation occurred without due process of law." *Williams* v. *Seniff*, 342 F.3d 774 at 786-87 (7th Cir. 2003) (citations omitted).

### 1.    Property Interest

To succeed on his due process claim, Cotter must first establish that he possessed a property interest that is protected by the Constitution. *See Border* v. *City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996). Property interests are not created by the Constitution but may "arise from a state statute, regulation, municipal ordinance, or an express or implied contract –

27

those rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* (internal quotations and citations omitted). In some instances, promises made by an employer in its employee handbook can give rise to a legitimate claim of entitlement sufficient to be protected as a property interest. *Id.*, *citing Campbell* v. *City of Chicago*, 940 F.2d 1111, 1112 (7th Cir. 1991).

Because Cotter was employed in Illinois, the court looks to Illinois law to determine whether he had a property interest in his position as a part-time police officer. *Id.* In *Duldulao* v. *St. Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 505 N.E.2d 314, 318 (Ill. 1987), the Illinois Supreme Court held that "an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present." *Id.* To establish a contractual property interest in employment based on an employee handbook or policy statement, three conditions must be satisfied:

> First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement.

*Id.* In this case, Cotter contends that the SOPs adopted by the Village in 1996 created a property interest in his job by requiring certain procedures before he could be fired.

Without identifying specific language, Cotter asserts that the statements in the SOPs establishing procedures for "internal investigations" and "dismissals" created an enforceable contract right. Yet, "[m]ere procedural rights . . . do not of themselves give rise to property interests protected under the Fourteenth Amendment." *Heck* v. *City of Freeport*, 985 F.2d 305, 311 (7th Cir. 1993). Cotter, instead, must establish that he had a property interest in his continued

28

employment; in other words, that his employment was other than at-will. *See Campbell* v. *City of Champaign*, 940 F.2d 1111 at 1113 (7th Cir. 1991) ("When the claimed deprivation is the loss of a job, the entitlement must be to the job, rather than to a set of disciplinary procedures.).

Cotter, however, has cited to no language in the SOPs that contains a promise of continuing employment or any assurance that a police officer may be removed, suspended, or terminated only for just cause. Likewise, Cotter has failed to identify any language in any other provision within the SOPs that would give rise to a clear promise that his employment was anything other than at-will, which is the presumption in Illinois. *Cf. Duldulao*, 505 N.E.2d at 318 (employee handbook gave rise to an enforceable right where the handbook stated that termination of a permanent employee "cannot occur" without proper notice and investigation, permanent employees "are never dismissed without prior written admonitions and/or investigation, and three warnings "are required" before an employee is dismissed.). In the absence of a clear promise of continued employment, Cotter cannot establish that he had a property interest in his position as a part-time police officer with the Village. As such, defendants are entitled to summary judgment on Cotter's due process claim.

2.      Due Process of Law

Even if the court were to find that the SOPs gave Cotter a property interest in his continued employment, Cotter's due process claim fails because he received all of the process that he was due. Due process requires that a public employee facing termination be given a meaningful opportunity to contest the reasons for his dismissal. *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 546, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985); *Baird* v. *Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 690-91 (7th Cir. 2004). This includes

29

oral or written notice of the charges, an explanation of the employer's evidence, and an

opportunity for the employee to present his side of the story. *Loudermill*, 470 U.S. at 546;

*Dupuy* v. *Samuels*, 387 F.3d 493, 504 (7th Cir. 2005). Additionally, the decisionmaker must be

impartial. *Bakalis* v. *Golembeski*, 35 F.3d 318, 323-26 (7th Cir. 1994). Cotter argues that the

procedures that he was provided did not satisfy these requirements in two respects.

First, Cotter argues that charges were never brought against him. Cotter asserts that it

is disingenuous for the Village to state that charges had not been brought and then to list the

charges against Cotter. The court assumes that Cotter is referring to the June 18, 2003 letter in

which Morris stated that he was recommending to the Board of Trustees that Cotter be

terminated as an employee and police officer of the Village. This letter asserted defendants'

legal argument that Cotter had no property interest in his position as a Village police officer and

stated that had the Village been obligated to provide Cotter a list of charges in order to terminate

him, the charges would have included (1) conduct unbecoming a police officer and (2) violation

of the public trust and confidence in connection with the Meijer store incident and (3) acquiring

and displaying his personal vehicle license plates registered to the Village's police department

and the Village's address without authorization from the Village, (4) potentially exposing the

Village to liability. While it is true that Cotter was never formally "charged" with these

allegations, Cotter has not cited to any legal authority for the proposition that formal charges or

something akin to an indictment must be filed against an employee in order to satisfy the

requirements of due process. Due process, instead, is a flexible concept "that calls for such

procedural protections as the particular situation demands." *Gilbert* v. *Homar*, 520 U.S. 924,

930, 138 L. Ed. 2d. 120, 117 S. Ct. 1897 (1997) (citation omitted).

30

To the extent that Cotter challenges the sufficiency of the notice he received, this argument also fails. Generally, the notice must be "reasonably calculated to apprise interested parties of the pendency of the action." *Birdsell* v. *Bd. of Fire and Police Comm'rs*, 854 F.2d 204 at 207 (7th Cir. 1988), *quoting Mullane* v. *Central Hanover Bank and Trust Co.*, 339 U.S. 306 at 314, 94 L. Ed. 865, 70 S. Ct. 652 (1950). The June 18, 2003 letter described the reasons why Morris was seeking Cotter's removal and specified which incidents gave rise to those reasons. The letter also instructed Cotter to contact Morris if Cotter wanted to discuss the charges and termination with the Police Committee. The procedure used by the Village ensured both that Cotter would receive notice of the charges against him and provided him with an opportunity to present his objections, thereby satisfying the minimum requirements of due process.[11] *See Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15, 94 L. Ed. 865, 70 S. Ct. 652 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

Additionally, even if the court were to assume that this single letter failed to provide sufficient notice to Cotter of the charges against him and of the opportunity to present his objections, the subsequent measures undertaken by defendants to involve Cotter in the

---

[11]Notably, Cotter does not argue that he was entitled to a hearing before being placed on administrative leave; instead, Cotter argues that charges were never brought against him and that he was never provided with a proper explanation of the evidence against him. Defendants argue both that Cotter was not entitled to an administrative hearing prior to his placement on administrative leave, citing to *Gilbert* v. *Homar*, 520 U.S. 924, 931-32, 138 L. Ed. 2d 120, 117 S. Ct. 1807 (1997), and that Cotter received due process in connection with the post-administrative leave proceedings. By failing to respond to defendants' argument that Cotter was not entitled to a hearing before being placed on administrative leave, Cotter has waived his opposition. *See Volovsek* v. *Wis. Dep't of Agric., Trade, & Consumer Prot.*, 344 F.3d 680, 689 n.6 (7th Cir. 2003).

31

termination proceedings satisfied the minimum requirements of due process. Although Cotter did not request to meet with the Police Committee, the Police Committee advised Cotter in a letter from Britz dated October 14, 2003 that the Police Committee would meet on October 27, 2003 at 7:00 to review Morris' recommendation and invited Cotter to attend the meeting to discuss the reasons for his termination. Cotter attended the October 27, 2003 meeting, during which the complete Kane County report and the list of charges against Cotter were read, but Cotter did not respond to the allegations against him or present his version of the events. Moreover, after the Police Committee voted to uphold Morris' recommendation and make a recommendation to the Board of Trustees to terminate Cotter's employment, the matter was tabled until the Board of Trustees meeting of January 6, 2004. Cotter was notified of the upcoming Board of Trustees meeting in a letter from Britz dated December 19, 2003. This letter invited Cotter to attend the meeting and to discuss the reasons for his termination with the Board. Cotter attended the meeting but did not respond to the allegations against him or present his version of the events. Thus, Cotter was provided notice of the charges against him and an opportunity to contest the charges, which satisfies the minimum requirements of due process.

Cotter's second challenge to the procedures that he was afforded is to the explanation of the evidence against him. Cotter argues that he was never provided a proper explanation of the evidence against him because he was never allowed to see the materials from which Moisa read during the October 27, 2003 Police Committee meeting. He further asserts that listening to ten pages being read aloud fails to amount to a proper explanation of the evidence against him as required by *Loudermill* but fails to argue why the reading of the evidence was not a proper explanation. The reading of the report is certainly a more thorough explanation than a mere

32

summary of the evidence. While it is true that Cotter may have found himself unable to respond to every minute detail contained within the police report, the reading of the report and of the grounds for his termination notified Cotter of the evidence against him. The court is unclear as to what further explanation of the evidence would be necessary or even possible under the circumstances, and Cotter offers no suggestion as to what would have constituted a more appropriate explanation of the evidence.

Additionally, as Cotter readily concedes, he chose not to respond to the reasons offered for his dismissal at either meeting that he attended. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Hudson* v. *City of Chicago*, 374 F.3d 554 (7th Cir. 2004), *quoting Dusanek* v. *Hannon*, 677 F.2d 538, 543 (7th Cir. 1982).

Because Cotter has failed to establish a genuine issue of material fact with regard to his claim that he was denied due process, defendants are entitled to summary judgment on that claim.[12]

## C. CONSPIRACY

For his § 1983 claim of conspiracy, Cotter maintains that the defendants conspired to deprive him of his constitutional rights by placing him on administrative leave in retaliation for his protected speech. In order to state a conspiracy claim under § 1983, a plaintiff must show "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in the

---

[12]In granting defendants' motion for summary judgment on Cotter's due process claim, the court finds it unnecessary to address the arguments raised by the individual defendants regarding their qualified immunity and offers no opinion in that regard.

furtherance of the agreement." *Scherer* v. *Balkema*, 840 F.2d 437 at 442 (7th Cir. 1988), cert. denied 486 U.S. 1043, 100 L. Ed. 2d 620, 108 S. Ct. 2035 (1988). Because the court has determined already that Cotter failed to establish the necessary illegal purpose of the conspiracy, *i.e.*, First Amendment retaliation, Cotter cannot establish his claim of conspiracy. *See, e.g.*, *Goetzke* v. *Ferro Corp.*, 280 F.3d 766 at 777-78(7th Cir. 2002)(plaintiff failed to establish that defendants engaged in the unlawful activity of retaliatory discharge, thereby foreclosing plaintiff's claim of civil conspiracy). Thus, summary judgment in favor of defendants is appropriate on Cotter's conspiracy claim.

## D.  BREACH OF CONTRACT CLAIM

Because the court has dismissed the claims over which it had original jurisdiction, the court declines to exercise its supplemental jurisdiction over Cotter's state law claim and dismisses it without prejudice. *See Bilow* v. *Much Shelist Freed Denenberg Arment & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001).[13]

---

[13]Because the court granted defendants' motion for summary judgment as to the substance of Cotter's claims over which it has original jurisdiction, the court finds it unnecessary to address the Village's argument that *respondeat superior* cannot be relied on as a basis for imposing liability and offers no opinion in that regard.

## ORDER

For the reasons stated above, Cotter's motion to strike [#40] is granted in part and denied in part; defendants' motion to strike [#49] is denied, and defendants' motions for summary judgment [#19, 20, 21] are granted. The clerk is instructed to enter judgment in favor of defendants. All future dates are stricken. This case is terminated.

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Date: January 25, 2006